IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES *ex rel.* JOHN RECTOR, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> BON SECOURS RICHMOND HEALTH CORPORATION, *et al.*, <br><br> Defendants. | Civil Action No. 3:11-CV-38 |

## MEMORANDUM OPINION

THIS MATTER is before the Court on a Motion to Dismiss Relator John Rector's ("Rector" or "Relator") Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) filed by Defendants Bon Secours Health System, Incorporated, Bon Secours Richmond, LLC, Bon Secours Hampton Roads Health Systems, Incorporated ("BS Hampton"), Bon Secours Richmond Health System ("BS Richmond"), Bon Secours Hampton Roads, Bon Secours Richmond Health Corporation, Bon Secours Virginia, and John Doe Corporations 1-10 (collectively, "Named Defendants" or "Bon Secours"). (ECF No. 75.) For the reasons that follow, the Court will GRANT Defendants' Motion and DISMISS Relator's Second Amended Complaint WITHOUT PREJUDICE.

I.    **BACKGROUND**[1]

A.  **The " Concierge Program"**

1. Generally

In or about 2006, Bon Secours implemented a program to provide concierge services to BS Richmond-affiliated and non-affiliated physicians in exchange for obtaining patient referrals

---

[1] For the purposes of this Motion, the Court assumes all of Plaintiffs' well-pleaded allegations to be true, and views all facts in the light most favorable to Plaintiffs. *T.G. Slater & Son v. Donald P. & Patricia A. Brennan, LLC*, 385 F.3d 836, 841 (4th Cir. 2004) (citing *Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)); *see* Fed. R. Civ. P. 12(b)(6).

to Bon Secours facilities ("Concierge Program"). Specifically, since at least 2006, BS Richmond provided such services to participating physicians through the concierge department of its shared services division. Since at least 2009, BS Hampton has also provided such services. BS Richmond is affiliated with St. Mary's Hospital (Richmond, VA), Memorial Regional Medical Center (Mechanicsville, VA), Richmond Community Hospital (Richmond, VA), St. Francis Medical Center (Midlothian, VA), and the Heart Institute at Reynolds Crossing (Richmond, VA). BS Richmond is also affiliated with several imaging centers—St. Mary's Hospital, Memorial Regional Medical Center, St. Francis Medical Center, Richmond Community Hospital, Bon Secours Imaging Center Reynolds Crossing, Laburnum Diagnostic Imaging Center and St. Francis Imaging Center—and with the Bon Secours Medical Group, comprising approximately 200 affiliated physicians. BS Hampton is affiliated with DePaul Medical Center (Norfolk, VA), Harbour View Health Center (Suffolk, VA), Mary Immaculate Hospital (Newport News, VA), Maryview Medical Center (Portsmouth, VA), Bon Secours Health Center at Virginia Beach (Virginia Beach, VA), and three assisted living residences, located in Norfolk and Portsmouth, Virginia and in St. Petersburg, Florida (collectively, "Bon Secours Facilities").

Through the Concierge Program, patient-physician practice liaisons ("Concierges") were hired by Bon Secours to provide a wide array of services to physicians who referred their patients to Bon Secours for diagnostic tests. Bon Secours's Concierge Program was designed to alleviate personnel and financial burdens on referring physicians' offices by scheduling patients, obtaining insurance pre-authorizations, communicating with patients and testing facilities, collecting patient co-payments and deductible payments, and performing additional tasks on behalf of the referring physicians upon request.

### 2.    Coding by Concierges

Rector reports that approximately eighty percent of participating physicians failed to submit complete forms to the Concierge Program. Concierges were instructed to assign International Statistical Classification of Diseases and Related Health Problems, 9th Revision

("ICD-9") codes and related Current Procedural Terminology ("CPT") codes. Concierges were not licensed medical professionals authorized to diagnose patients or select appropriate procedures. As such, in determining patient diagnoses, the Concierges were instructed to use internal manuals and "cheat sheets" created by Bon Secours managers that list only those ICD-9 codes and related CPT codes for those diagnoses and procedures that are covered by Medicare, Medicaid, or other insurance plans. Managers repeatedly instructed Concierges to never reveal the existence of these manuals or "cheat sheets" to insurers or physicians' offices. Concierges selected from these codes in order to ensure that patient procedures or administered tests were coverable by relevant third-party payers or insurance programs. Further, Bon Secours's concierge computer system "red lighted" any orders with codes not covered by patient insurers. (Second Am. Compl. ¶ 16). Bon Secours steered patients to testing or procedures based on revenue determinants by instructing Concierges to change the "red lighted" patient orders into ones that were covered for payment before they were "green lighted" for submission. (*Id.*). Lastly, Concierges were instructed by Bon Secours managers to refer participating physicians' patients to Bon Secours facilities regardless of whether or not those facilities were in a patient's insurance network.

If an affiliated physician failed to sign an order for diagnostic testing or therapeutic procedures, or if an unauthorized person signed a patient form or ordered a procedure without submitting an order form and the physician's signature could not be expeditiously obtained, Bon Secours directed its Concierges to cut and paste physicians' signatures from past orders ("Cut and Paste Practice"). Bon Secours managers were well aware of this practice, and Rector was trained to engage in this conduct by Bon Secours employees. The practice continued even after Relator and other Concierges raised questions and concerns about it. Bon Secours also systematically completed missing portions of physicians' orders and other documentation that physicians' offices are required to complete. If information was missing or unclear in documentation, Concierges were instructed by Bon Secours's management not to call

3

physicians' offices but, instead, to call patients, falsely identify themselves as calling from the physicians' offices, and attempt to determine the proper diagnosis and procedure ordered. Further, Bon Secours's management directed diagnostic lab personnel to call their Concierges with questions, including questions about diagnoses, procedures, and medication instead of calling physicians' offices. Bon Secours management directed the Concierges not to provide any services in connection with patients who expressed a preference to have their tests done at a non-Bon Secours facility. Further, Concierges were instructed to inform physician's staff that they would need to handle their own scheduling and paperwork if a patient went to a non-Bon Secours facility.

### 3. "On-Site" Concierges

The Concierge Program included Concierges who sat in a centralized location at Bon Secours facilities and communicated by phone, fax, and over the computer ("Virtual Concierges") and those whom Bon Secours assigned to work in the actual offices of select medical practices ("On-site Concierges"). Relator represents that BS Richmond employs approximately thirty Concierges, the majority of whom are located at a central processing center at 8580 Magellan Parkway in Richmond, Virginia. Relator further represents that approximately eight to ten of the BS Richmond Concierges are On-site Concierges assigned to work full-time in "high-volume" referring physicians' offices and/or those with high potential. (*Id.* ¶ 19). Relator estimates that these thirty Concierges process fifteen patients per day for a total of approximately 450 patients per day throughout the BS Richmond concierge department. Relator estimates that the average claim processed by Bon Secours Concierges is approximately $1,000.00. Rector reports that, on multiple occasions, additional Concierges were hired by a concierge manger, Wade Williams, after being approved by "the Chief Financial Officer and the Chief Executive Officer." (*Id.* ¶ 87). Bon Secours estimated that each additional Concierge would result in a twenty-three percent increase in referrals and, in one case, even stated that placing an

On-site Concierge would enable Bon Secours to control referrals to Memorial Regional Medical Center, a Bon Secours-owned hospital in Richmond.

On-site Concierges provided numerous services that would otherwise be performed by paid physicians' staff. "Bon Secours intended that the On-site Concierges would network and align themselves as a part of the [physician's] office team providing direct feedback from physicians, patients and staff [and providing] immediate results to the physicians." (*Id.* ¶ 95) (internal quotation marks omitted). Relator reports that On-site Concierges had the effect of decreasing the overhead of physicians' offices to the point where physicians were able to lay off employees. Specifically, Grove Family Practice and West End Internal terminated employees for this reason. Bon Secours provided these free services solely to physicians who referred patients to facilities owned by, or affiliated with, Bon Secours.

### 4.   Benefit to Bon Secours

Bon Secours's management tracks how many physicians and medical practices enroll with the program, compares how many patients they refer to Bon Secours labs, and calculates the profitability of the program. Bon Secours's internal financial records tracked the monetary value of physician referrals from the Concierge Program for each year and included projections of revenue associated with the Concierge Program for each year. Williams stated that physician participation in the Concierge Program has expanded since he started with the program in 2007 and that Bon Secours was able to use the program to "gain market share in the community." (*Id.* ¶¶ 100-01). "[A]pproximately 50% of patients referred through the BS Richmond Concierge department to Bon Secours's diagnostic and therapeutic facilities are Medicare beneficiaries, and approximately 25% of those patients are Medicaid beneficiaries." (*Id.* ¶ 20). An August 2008 internal presentation prepared by the, then, Vice President for Planning and Marketing for Bon Secours, Michael A. Spine, reported that Bon Secours increased its referral business an average of 23% as a direct result of the Concierge Program and touted a 48% return-on-

investment, with the Concierge Program generating nearly six million in income over the previous year.

5. <u>Billing the Federal Government</u>

Relator represents that the BS Richmond Concierge department bills approximately $120,000,000.00 per year in medical claims, of which 80% are based on unsubstantiated or unsupported medical diagnoses, and 100% of which are the result of arrangements between referring physicians and Bon Secours pursuant to the Concierge Program. (*Id.* ¶ 132). Relator estimates that "approximately 50% of patients referred through the Bon Secours Concierge department to Bon Secours diagnostic and therapeutic facilities are Medicare beneficiaries and approximately 25% of those patients are Medicaid beneficiaries, resulting in damages to the Government of approximately $90,000,000.00 per year since 2006." (*Id.* ¶ 133).

**B.  Relator's Role**

In August 2007, BS Richmond hired Rector through a temporary employment agency to work as a part-time Concierge for BS Richmond's Shared Services Division. (Second Am. Compl. ¶ 32). Rector had no prior health care experience, training, or education. Rector began his full-time employment at BS Richmond in November of 2007. As a Concierge, Rector completed, submitted, and obtained authorization for diagnostic testing and therapeutic procedures, scheduled patient appointments, followed up with patients after their appointments, and collected co-payments and deductible payments for services being rendered.

Concierges, including Rector, maintained lists of patients referred by participating physicians that indicated each patient's insurance coverage, including Medicare and Medicaid beneficiaries. Rector and other Concierges also kept a log of patients whose diagnostic testing they handled. These logs indicated the identity of the referring physician or practice group, as well as the patient's type of insurance coverage. Relator's log from January/February 2008 showed that Medicaid and Medicare-covered patients were referred to Bon Secours facilities by physicians participating in the Concierge Program. (Second Am. Compl. Ex. A). The patient log

consists of a spreadsheet including, but not limited to, patient names and social security numbers, types of procedures scheduled, scheduled dates of procedures, actual dates and times of procedures, facilities in which procedures were completed, the names of referring physician and their practices, and the insurance of the patients. (*Id.*)

In or about May or July of 2008, Williams introduced Relator as a potential On-site Concierge for Richmond Gastroenterology Associates at St. Mary's Hospital. During the visit, Richmond Surgical Group's office manager told Relator that he might be needed to answer phones during his lunch hour and to perform office tasks for the medical group. In response, Williams told Rector that Bon Secours would approve of the practice if he would be willing to give up his lunch hour. BS Richmond later offered him the position, along with a ninety cent per hour raise. Relator, however, declined the position.

In late November and December of 2009, Rector documented three orders from a medical group, Grove Avenue Family Practice in Richmond, Virginia, on which he selected codes from the BS Richmond manual and cheat sheets because no ICD-9 codes had been provided. Relator also completed an order from PartnerMD, a medical practice with an office in Richmond, Virginia. There, Rector "coded" an order for an MRI received by PartnerMD by contacting a patient, discussing the patient's diagnosis and, in consultation with other Bon Secours Concierges in the workspace that day, locating a billable ICD-9 code pursuant to which Bon Secours could obtain reimbursement. Last, Rector represents that on a number of occasions he was told by Bon Secours radiologists to "simply use his own discretion in determining whether or not a particular radiology procedure should be performed with or without contrast." (*Id.* ¶ 114). Relator reports that tests would occasionally need to be repeated as a result of errors in CPT coding regarding contrast.

### C.  Retaliation Against Rector

Relator became concerned about multiple practices at BS Richmond including: (1) the fact that he and other Concierges were hired with little healthcare education, training,

credentials, or experience; (2) the use of "cheat sheets;" (3) the improper way in which BS Richmond treated patient privacy; (4) the Cut and Paste Practice; (5) and patient wellbeing. Relator repeatedly voiced concerns over these practices but did not press the issue because he feared for his job.

On or about December 24, 2009, Relator was processing an order for diagnostic testing because a physician's office was closed. Relator employed the Cut and Paste Practice. His supervisor said that he was not allowed to do so and took the order from him. After seven minutes, she reappeared with a signed order, explained that she was able to obtain the physician's signature, and reprimanded him for his suggestion that they use the Cut and Paste Practice. At one point, Rector confronted Erin Baggett, a new supervisor, on her denial that Bon Secours trainers had instructed Concierges to use the Cut and Paste Practice. On January 5, 2010, while an investigation into the matter was pending, Defendants terminated Rector for "insubordination"—speaking to a colleague about the situation—and for falsifying a physician signature in violation of company policy.

## II.     PROCEDURAL HISTORY

On January 18, 2011, Rector filed a *qui tam* complaint under seal against four Defendants. On April 19, 2013, the case was unsealed after the United States and the Commonwealth of Virginia declined to intervene. On August 5, 2013, Rector filed his First Amended Complaint which, among other things, added information about specific false claims, including a patient log prepared by Rector in the course of his employment.

On September 17, 2013, Rector filed his Second Amended Complaint, changing three defendants and adding ten John Doe corporations. In Counts I, II, III, IV, and V of the Second Amended Complaint, Rector alleges violations of the False Claims Act ("FCA"). In Count VI of

the Second Amended Complaint, Rector alleges violations the Anti-Kickback Statute ("AKS"). In Count VII, Rector alleges violations of the Virginia Fraud Against Taxpayers Act ("VFATA").[2]

Regarding the federal claims, Relator demands that Defendants pay: (1) amount equal to three times the amount of damages the United States has sustained because of Defendants' actions,[3] (2) a civil penalty of not less than $5,500.00 and not more than $11,000.00 or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. §§ 3729 *et seq.*; (3) $50,000.00 for each violation of 42 U.S.C. § 1320a-7a(a)(7) of the Medicare/Medicaid Anti-Kickback Statute; (4) $15,000.00 for each violation of the Stark Act (and/or $100,000.00 for intentional schemes violative of the Stark Act); (5) the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act and/or any other applicable provision of law to Relator; (6) all costs and expenses of this action, including attorneys' fees; (7) and such relief as is appropriate under the provisions of 31 U.S.C. § 3730(h) of the False Claims Act for retaliatory discharge, including: (a) two times the amount of back pay with appropriate interest; (b) compensation for special damages sustained by Relator in an amount to be determined at trial; (c) litigation costs and reasonable attorneys' fees; (d) such punitive damages as may be awarded under applicable law; (8) reasonable attorneys' fees and litigation costs in connection with Relator's Section H claim; and (9) other and further relief as the Court may deem to be just and proper.

Regarding the state claims, Relator demands: (1) that Relator and Virginia be awarded statutory damages in an amount equal to three times the amount of actual damages sustained by Virginia as a result of Defendants' actions, as well as the maximum statutory civil penalty for each violation by Defendants, all as provided by VFATA; (2) a relator's share of any judgment to the maximum amount provided pursuant VFATA; (3) all costs and expenses associated with the

---

[2] Rector also alleges violations of the Stark Law (Social Security Act § 1877; 42 U.S.C. § 1395nn). While this cause of action is not enumerated separately, Rector does mention it in his demand for damages.

[3] Relator estimated these damages to be approximately $90,000,000.00 per year since 2006. (*See* Second Am. Compl. ¶ 133).

pendent state claims, plus attorneys' fees pursuant to VFATA; and (4) other and further relief as the Court may deem to be just and proper.

Defendants filed their Motion to Dismiss Second Amended Complaint on November 22, 2013. Rector filed his Opposition on December 20, 2013. Defendants' Reply was filed on Jan 3, 2014. A hearing was held on January 29, 2014 and this matter is ripe for review.

### III.    LEGAL STANDARD

A motion to dismiss for failure to state a claim upon which relief can be granted challenges the legal sufficiency of a claim, rather than the facts supporting it. Fed. R. Civ. P. 12(b)(6); *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007); *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). A court ruling on a Rule 12(b)(6) motion must therefore accept all of the factual allegations in the complaint as true, *see Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999); *Warner v. Buck Creek Nursery, Inc.*, 149 F. Supp. 2d 246, 254-55 (W.D. Va. 2001), in addition to any provable facts consistent with those allegations, *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984), and must view these facts in the light most favorable to the plaintiff, *Christopher v. Harbury*, 536 U.S. 403, 406 (2002). The Court may consider the complaint, its attachments, and documents "attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Sec'y of State for Defence v. Trimble Navigation Ltd.,* 484 F.3d 700, 705 (4th Cir. 2007).

To survive a motion to dismiss, a complaint must contain factual allegations sufficient to provide the defendant with "notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Rule 8(a)(2) requires the complaint to allege facts showing that the plaintiff's claim is plausible, and these "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *see id.* at 555 n.3. The Court need not accept legal conclusions that are presented as factual allegations, *id.* at 555, or "unwarranted inferences,

unreasonable conclusions, or arguments," *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

"In addition to meeting the plausibility standard of *Iqbal,* fraud claims under the Act must be pleaded with particularity pursuant to Rule 9(b) of the Federal Rules of Civil Procedure." *United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Under Rule 9(b): "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

## IV.    ANALYSIS

### A.  False Claims Act

Relator alleges that Defendants violated the FCA under four theories: (1) presentation of false claims under 31 U.S.C. § 3729(a)(1)(A); (2) making or using false record or statement to cause a claim to be paid (commonly referred to as a "false certification claim") under 31 U.S.C. § 3729(a)(1)(B); (3) making or using false record or statement to avoid an obligation to refund (commonly referred to as a "reverse false claim") under 31 U.S.C. § 3729(a)(1)(G); and conspiracy under 31 U.S.C. § 3729(a)(1)(C). "The test for False Claims Act liability . . . is (1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a 'claim')." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 788 (4th Cir. 1999).

#### 1. Count II: False Certification Claim
##### a.    Rule 9(b) and Submission of Claims to the Government

Generally, false certification arises where (1) "a government contract or program required compliance with certain conditions as a prerequisite to a government benefit, payment, or program;" (2) "the defendant failed to comply with those conditions;" and (3) "the defendant

falsely certified that it had complied with the conditions in order to induce the Government benefit." *United States ex rel. Badr v. Triple Canopy, Inc.*, No. 1:11-CV-288, 2013 WL 3120204, at *10 (E.D. Va. June 19, 2013) (quoting *United States ex rel. Godfrey v. KBR, Inc.,* 360 F. App'x 407, 411–12 (4th Cir. 2010)). These requirements must also be met in light of the heightened pleading standard for fraud under Rule 9(b). *Harrison,* 176 F.3d at 784.

To satisfy Rule 9(b), a relator "must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.,* 525 F.3d 370, 379 (4th Cir. 2008) (citation and internal quotation marks omitted). Moreover, in the Fourth Circuit, a relator asserting FCA claims is required to plead more than the mere existence of a fraudulent scheme that supports the inference that false claims were presented to the Government. *Nathan,* 707 F.3d at 456. Relators must allege with some indicia of reliability that an actual false claim was submitted to the Government. *Id.* at 456-57. "[W]ithout such plausible allegations of presentment, a relator not only fails to meet the particularity requirement of Rule 9(b), but also does not satisfy the general plausibility standard of *Iqbal.*" *Id.* at 457. In reaching its conclusions, the Fourth Circuit acknowledged that relators face practical challenges in meeting the pleading requirements of Rule 9(b) such as not having independent access to records evidencing false claims. *See id.* Nonetheless, the Fourth Circuit held that "when a defendant's actions, as alleged and as reasonably inferred from the allegations, *could* have led, but *need not necessarily* have led, to the submission of false claims, a relator must allege with particularity that specific false claims actually were presented to the Government for payment." *Id.* The Fourth Circuit explained that Rule 9(b) has multiple purposes including providing notice to defendant of their alleged misconduct, prevention of frivolous suits, eliminating fraud actions where all of the facts are learned after discovery, and protecting defendants from harm to their good will and reputation. *Id.* at 456 (citing *Harrison,*

176 F.3d at 784). Accordingly, Rule 9(b) is to be applied strictly to cases brought under the FCA. *Id.* at 456.

The primary evidence that Rector proffers to show that false claims were in fact submitted to the Government for benefit is a log of patients that he created while he worked as a Concierge for BS Richmond. The patient log consists of a spreadsheet including, but not limited to, patient names and social security numbers, types of procedures scheduled, scheduled dates of procedures, actual dates and times of procedures, facilities in which procedures were completed, the names of referring physician and their practices, and the insurance of the patients. (Second Am. Compl. Ex. A). Rector's argument that Defendants submitted or caused others to actually submit false claims to the Government rests upon the fact that some of the patients listed in the patient log were covered by Medicare, Medicaid, or TriCare. (*See* Second Am. Compl. ¶¶ 104, 132-33).

Regarding Relator's claims that the Defendants in this matter submitted false claims to the Government themselves, Rector's production and subsequent allegations are not enough to satisfy the heightened pleading requirements of Rule 9(b). *See, e.g., United States ex rel. Ge v. Takeda Pharm. Co. Ltd.*, 737 F.3d 116, 124 (1st Cir. 2013). Rector's pleadings are similar to the relator's in *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1306 (11th Cir. 2002). In *Clausen*, the relator simply provided a form with certain medical test codes and asked the court to infer that the charges were actually incurred. *See id.* There, the relator failed to meet the requirements of Rule 9(b) where he could not plausibly allege the actual presentment of false claims to the Government despite being able to identify specific long-term care facilities, patients, dates of testing, and testing procedures. *Id.* at 1315. Much like the relator in *Clausen*, Rector has been unable to provide any billing information such as copies of a single actual bill or claim or payment, amounts of any charges, actual dates of claims, policies about billing or even second hand information about billing practices. *See id.*

While Rule 9(b) does not require Rector to allege his claim by a preponderance of evidence, "some of [the] information for at least some of the claims must be pleaded in order to satisfy Rule 9(b)." *Id.* at 1312 n.21. Nothing in the record indicates that any of the Named Defendants necessarily submitted false claims to the Government. In fact, the Parties dispute whether Defendants are even providers of Medicare.[4] Additionally, Relator has provided no accounting documents or actual claims submitted by the Named Defendants indicating when they submitted false claims. Thus, he cannot plausibly claim that the Named Defendants themselves *actually* submitted false claims. Rector cannot cure this deficiency by asserting any firsthand knowledge of the billing processes of any Defendant, named or unnamed. *See United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1358-59 (11th Cir. 2006) ("[Relator] fails to provide the next link in the FCA liability chain: showing that the defendants *actually submitted* reimbursement claims for the services he describes. Instead, he portrays the scheme and then summarily concludes that the Named Defendants submitted false claims to the Government for reimbursement.").

The FCA also reaches claims that are rendered false by one party, but submitted to the Government by another. *United States ex rel. DeCesare v. Americare In Home Nursing*, 757 F. Supp. 2d 573, 588 (E.D. Va. 2010). Here, unable to plausibly allege that any Named Defendant actually submitted claims to the Government, Rector asserts that Bon Secours caused others to submit false claims; specifically, that Bon Secours caused doctors participating in the Concierge Program to refer patients to Bon Secours Facilities. Relator does not refer to these facilities by name; however, he does delineate a medical group, and multiple hospitals, imaging centers, medical centers, and assisted living residences affiliated with BS Richmond and BS Hampton. (*See* Second Am. Compl. ¶¶ 39-40). Relator also alleges, "upon information and belief," that specific physician practices have referred patients to Bon Secours facilities as a result of the Concierge Program. (*Id.* ¶ 96). Relator goes on to state that the patient log "lists . . . patients who

---

[4] (*See* Hr'g Tr. 10). Rector argues that Defendants' contention is suspect, in part, because a Bon Secours website touts that "Bon Secours is a certified licensed Medicare Provider." (Relator's Opp'n 15 n.6).

received services for which Bon Secours billed a government health insurance program." (*Id.* ¶ 104).[5] It appears that the initials of the various facilities that patients were referred to in the patient log correspond to at least some of the listed Bon Secours Facilities. For example, "SMH" likely refers to Saint Mary's Hospital. As such, Rector can plausibly allege that certain patients were referred to Bon Secours Facilities where procedures where scheduled and that these patients had health insurance through Medicare, Medicaid, or Tricare. Rector then concludes, without any factual support, that the Bon Secours Facilities actually submitted claims to the Government. (*See Id.* ¶¶ 103-104).

Relator's log is not enough to plausibly allege that the procedures necessarily took place or that the Government was billed by any Bon Secours Facility or physician. *See Nathan*, 707 F.3d at 460 (holding that a relator did not identify with particularity any claims that would trigger liability under the FCA because, in the absence of the required specific allegations, the court was unable to infer that a Medicare patient who received a prescription for an off-label use actually filled the prescription and sought reimbursement from the government); *Clausen*, 290 F.3d at 1315; *see also United States ex rel. Palmieri v. Alpharma, Inc.*, 928 F. Supp. 2d 840, 857 (D. Md. 2013). Relator's claim does not involve an integrated scheme in which presentment of a claim for payment was a necessary result because the patients could have paid for the relevant prescriptions and procedures themselves. *See Nathan*, 707 F.3d at 460-61. In effect, Relator is missing the final link in the chain of causation.

In sum, Rector has not pled with sufficient particularity under Rule 9(b) as to the Named Defendants, related John Doe Defendants,[6] Bon Secours Facilities, or relevant physicians.[7]

---

[5] At times, it seems that Relator seems to intend "Bon Secours" to reference the Named Defendants and at other times generally to refer to the parent company of Bon Secours. (*See Id.* ¶ 103) ("On or about January 8, 2008, a patient with the initials J.G. and a social security number ending in 2112 received MRI services for which Bon Secours billed Medicare."). These references, at times, frustrate the Court's ability to determine whether Relator can plead with particularity.

[6] Relator's claims fail to the extent that he relies on John Doe Defendants for the aforementioned reasons.

Because Rector has failed to plead with particularity, the Court declines to address the merits of the AKS and Stark Law claims at issue.

### b. Materiality

Rector states that all Medicare providers must prepare and submit to the Centers for Medicare and Medicaid Services ("CMS") a Medicare Enrollment form ("CMS-855 form") that includes a certification that the provider is and "will remain in compliance with all Medicare 'laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider]'s compliance with all conditions of participation in Medicare.'" (Second Am. Compl. ¶ 63). He then alleges that Defendants submitted such certifications to the Government to become eligible for Medicare reimbursement and to maintain their eligibility. (*Id.* at ¶ 64). In his Opposition, Rector avers simply that "when Defendants submitted claims to Medicare, they were not 'in compliance with . . . the Federal anti-kickback statute' as they had certified." (Relator's Opp'n 13).[8]

Even assuming that Defendants submitted CMS-855 forms and made a false certification or misrepresentation with the requisite scienter, to be actionable, the certification must also be material and have caused the government to pay a claim. *Harrison*, 176 F.3d at 788. CMS-855 forms are required to initiate the process of enrolling providers into the Medicare program. Multiple courts have held that CMS enrollment applications cannot serve as the basis for an FCA claims based on AKS allegations. *United States ex rel. Grenadyor v. Ukranian Vill. Pharmacy,*

---

[7] To the extent that Relator alleges a separate claim that Defendants submitted or caused others to submit false claims based on the allegation that BS Richmond employees cut and pasted physician signatures onto scheduling forms and improperly entered diagnostic procedure codes on those forms, these allegations also fail under Rule 9(b) for the aforementioned reasons.

[8] It must be noted that Rector has not plausibly alleged that any of the Named Defendants falsely certified compliance with the AKS or Stark Laws in CMS-855 forms. As stated above, the Parties dispute whether the Named Defendants are providers of Medicare. While Rector alleges that Defendants submitted CMS-855 forms, he does not provide any actual copies of CMS forms submitted by Defendants nor does he have any firsthand knowledge that Defendants submitted such forms. Instead, he infers through somewhat circular reasoning that Defendants must have submitted such forms because all providers of Medicare are required to do so. Relator has the burden of pleading with particularity under Rule 9(b) and, because he has no firsthand knowledge of whether Defendants submitted CMS-855 forms, must plead the grounds for his suspicions. *Bankers Trust Co. v. Old Republic Ins. Co.,* 959 F.2d 677, 684 (7th Cir. 1992).

*Inc.*, No. 09 C 7891, 2013 WL 6009261, at *4 (N.D. Ill. Nov. 7, 2013) (collecting cases that declined to impose FCA liability where relators based their claim on CMS enrollment application forms); *United States ex rel. Landers v. Baptist Mem'l Health Care Corp.*, 525 F. Supp. 2d 972, 978-79 (W.D. Tenn. 2007) (collecting cases that declined to impose FCA liability in cases where false certifications of compliance were not conditions of payment); *United States v. Dialysis Clinic, Inc.*, No. 5:09-CV-00710, 2011 WL 167246, at *14-15 (N.D.N.Y. Jan. 19, 2011). This is because the certification in the application is a promise concerning eligibility for enrollment into the Medicare program and not a false representation regarding a claim for payment. *Id.* (citing *United States ex rel. Kennedy v. Aventis Pharm., Inc.*, 610 F. Supp. 2d 938, 946 (N.D. Ill. 2009)). As such, the promises in the CMS-855 forms do not meet the materiality requirement for liability under the FCA. *Landers*, 525 F. Supp. 2d at 979. Relator argues that the certifications in the CMS-855 forms should be sufficient but relies on cases that address different documentation such as cost reports or provider agreements, which contain different language conditioning payment of Medicare claims on compliance with Medicare laws and regulations. *See, e.g.*, *United States ex rel. Parikh v. Citizens Med. Ctr.*, No. 6:10-CV-64, 2013 WL 5304057, at *6 (S.D. Tex. Sept. 20, 2013) (citing to cases where relators based false certification claims on cost report, claim forms); *United States ex rel. Osheroff v. Tenet Healthcare Corp.*, No. 09-22253-CIV, 2012 WL 2871264, at *8 (S.D. Fla. July 12, 2012); *see generally United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 392-93 (1st Cir. 2011) (regarding provider agreements).

In sum, Rector's Second Amended Complaint fails to meet the requisite element of materiality because the certification upon which he seeks to base his claims is insufficient. Specifically, Relator cannot rely solely on a CMS-855 Medicare enrollment application to establish liability under the FCA because the form fails the materiality requirement of *Harrison*. To the extent that Relator relies on Stark Law violations, Rector's false certification claim fails

for the same reasons that his AKS false certification claim fails. Accordingly, Relator's Second Amended Complaint fails to state a claim under the express false certification theory of liability.[9]

### c.   Implied Certification

To the extent that Relator relies on a theory of implied certification, his claim fails. "No Fourth Circuit decision has adopted the viability of an implied certification theory, and district courts have [rejected] claims predicated on the implied certification theory." *Badr*, 2013 WL 3120204, at *10; *see also United States v. Jurik*, 943 F. Supp. 2d 602, 610 (E.D.N.C. 2013); *United States ex rel. McLain v. KBR, Inc.,* No. 1:08CV499 (GBL/TCB), 2013 WL 710900, at *6 (E.D. Va. Feb. 27, 2013) ("The Fourth Circuit has not adopted this [implied certification] theory.").

### 2.        Count I: Rule 9(b) and the Submission of False Claims

Much like Rector's false certification claim, his allegation that Defendants submitted false claims to the Government fails for failure to plead with particularity under Rule 9(b). Rector has not plausibly alleged that the Named Defendants, Bon Secours Facilities, or participating physicians "necessarily" submitted false claims to the Government.

### 3.        Count III: Reverse False Claims

The previous version of the FCA imposed liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(7) (2008). The new provision, as amended by the Fraud Enforcement & Recovery Act ("FERA"), imposes liability on anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

---

[9] Because Rector's false certification claim fails on grounds of materiality and inadequate allegations that Defendants actually submitted claims to the Government, the Court declines to address the elements of falsity and scienter.

Without any false claims identified as the source of money that should have been repaid to the Government, Rector has failed to particularize or adequately allege a reverse-false-claims violation. *See United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 2013 WL 5340480, at *9 (N.D. Ga. Sept. 17, 2013) (where false-claims counts and reverse-false-claims counts are "two sides of the same coin," the same analysis applies to both). Accordingly, the Court will dismiss Count III.

### 4.        Count IV: Conspiracy

To prove an FCA conspiracy, a relator must show (1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim reimbursed by the Government and (2) at least one overt act performed in furtherance of that agreement. *United States ex rel. Ahumada v. Nat'l Ctr. for Emp't of the Disabled*, No. 1:06-CV-713, 2013 WL 2322836, at *4 (E.D. Va. May 22, 2013) (discussing an FCA conspiracy claim in the context the pre-FERA amended FCA). Moreover, "a plaintiff asserting a [conspiracy] claim under [the FCA] must show that the conspirators agreed to make use of the false record or statement to achieve this end." *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 665 (2008). The conspirators must have "shared a specific intent to defraud the Government." *DeCesare*, 757 F. Supp. 2d at 584.

Defendants claim that Relator's conspiracy claim fails because Defendants are legally incapable of conspiring with each other and because Relator does not allege facts showing an agreement. Relator contends that his conspiracy allegations are not limited to actions taken by the Defendants. He argues that his conspiracy claim includes "others not named as Defendants" including other John Doe Corporations, physician practices, and their employees. (Second Am. Compl. ¶¶ 42, 96, 152). Specifically, Rector alleges that physician referrers understood the objective of the scheme and steadily referred patients to Bon Secours facilities in exchange for Concierge Services. Rector represents that a medical practice called Express Med and 18 additional non-Bon Secours affiliated medical practices accepted Bon Secours Concierge

19

services in exchange for referrals. Rector reports that Dr. Ali Mollah of Express Med thanked

Bon Secours for the "fabulous service that you are providing us . . . ." (Second Am. Compl. ¶ 92).

As mentioned above, Rector's Second Amended Complaint fails to allege sufficient facts

to show even an individual violation of the FCA by Defendants. Further, the Named Defendants

are legally incapable of conspiring with each other because they are related entities or

subsidiaries. *See Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 771-72 & n.19

(1984). Accordingly, Relator's conspiracy claim, which is premised on his underlying FCA

violations, necessarily fails because Relator's individual FCA claims do not pass muster under

Rule 9(b). *See Godfrey*, 360 F. App'x at 413.

### 5.        Count V: Retaliation

Under 31 U.S.C. § 3730(h):

> [a]ny employee, contractor, or agent shall be entitled to all relief necessary to
> make that employee, contractor, or agent whole, if that employee, contractor, or
> agent is discharged, demoted, suspended, threatened, harassed, or in any other
> manner discriminated against in the terms and conditions of employment
> because of lawful acts done by the employee, contractor, agent or associated
> others in furtherance of an action under this section or other efforts to stop 1 or
> more violations of this subchapter.

31 U.S.C. § 3730(h) (2008). FERA broadened the scope of conduct protected by § 3730(h) from

"lawful acts . . . in furtherance of an action under this section" to "lawful acts . . . in furtherance

of other efforts to stop 1 or more violations of this subchapter." *Layman v. MET Labs., Inc.*, No.

CIV.A. RDB-12-2860, 2013 WL 2237689, *6-7 (D. Md. May 20, 2013); *compare* 31 U.S.C. §

3730(h) (2008), *with* 31 U.S.C. § 3730(h) (2012). In order to defeat a motion to dismiss on a

FCA retaliation claim, Rector must allege that (1) he engaged in protected conduct such as

taking acts in furtherance of an FCA suit or a related internal report; (2) his employer knew of

those acts; and (3) his employer treated him adversely because of these acts. *See United States*

*ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 735 (4th Cir.

2010); *see also Layman*, 2013 WL 2237689, at *5-6. "A protected activity need not indicate that

an actual FCA suit was being contemplated, but it must evince some attempt to expose possible

fraud. 'An employer is entitled to treat a suggestion for improvement as what it purports to be rather than as a precursor to litigation.'" *Id.* (quoting *Luckey v. Baxter Healthcare Corp.,* 183 F.3d 730, 733 (7th Cir. 1999)). The Fourth Circuit applies the objective "distinct possibility" standard to determine whether an employee has engaged in protected activity. *Glynn v. EDO Corp.,* 710 F.3d 209, 214 (4th Cir. 2013). Under this standard, Rector must show that he was investigating "matters that reasonably could lead to a viable FCA action." *Id.* (quoting *Eberhardt v. Integrated Design & Const., Inc.,* 167 F.3d 861, 868 (4th Cir. 1999)).

Rector sets forth his alleged "protected conduct" in paragraphs 138 through 140 of the Second Amended Complaint, (*see* Relator's Opp'n 37), which refer to generalized concerns including: BS Richmond's use of "cheat sheets" and management's directives to keep them secret from doctors, insurers, and patients; dangers to patient privacy; BS Richmond's Cut and Paste Practice; the shredding of important documents; and his worries about patients' wellbeing due to the prospect of duplicative testing. Rector states that he "repeatedly voiced concerns about these practices to Bon Secours management; however, managers made clear that his complaints were not welcome, and Relator did not press the issue out of concern for his own job." (Second Am. Compl. ¶ 140).

There is little that shows that any Defendant would have reasonably believed that Rector was acting in furtherance of an FCA action or a related internal report. There is no indication that Rector approached his employer about concerns related to the alleged fraud against the federal government or even the AKS and Stark law violations that he now uses to support his FCA claims. Instead, Rector essentially complained of what he perceived as shoddy or suspicious business practices and was generally "concerned that Defendants' activities were possibly violating Medicare and Medicaid statutes and regulations, including patient privacy laws." (*See* Second Am. Compl. ¶ 138). Further, Relator represents that he "did not press the issue out of concern for his own job." (Second Am. Compl. ¶ 140). The only fact that related to fraud or false certification under the FCA was Rector's protest of the use of "cheat sheets" to code insurance

21

bills, which does not necessarily relate to improper referrals. As Defendants point out, "[m]erely grumbling to the employer about . . . regulatory violations does not satisfy the [knowledge] requirement—just as it does not constitute protected activity in the first place." *Young*, 2013 WL 4498680, at *9 (quoting *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 743 (D.C. Cir. 1998)). Rector's retaliation claim fails because Rector has not alleged the requisite elements of his FCA claim. *See, e.g.*, *United States ex rel. Parks v. Alpharma, Inc.*, 493 F. App'x 380, 389-90 (4th Cir. 2012) (dismissing a claim in which "[relator's] complaints were clearly couched in terms of concerns and suggestions, not threats or warnings of FCA litigation").

### B.  Count VI: Violations of the AKS and Stark Law

Relator has voluntarily dismissed the claim related to the violation of the AKS. (Hr'g Tr. 26). To the extent that Relator attempts to assert a separate Stark Law claim, such a claim will be dismissed because the Stark Law does not have a private right of action. *See United States ex rel. Villafane v. Solinger*, 543 F. Supp. 2d 678, 700 (W.D. Ky. 2008).

### C.  Count VII: VFATA

Because the VFATA and FCA are analogous and Relator incorporates all of his arguments into both causes of action, Relator's VFATA claims will be dismissed for the very same reasons that his FCA claims fail.

### V.     ABILITY TO AMEND THE COMPLAINT

Under Rule 15(a)(2), a party may amend its pleading with the opposing party's written consent or the court's leave. Fed. R. Civ. P. 15(a)(2). The rule suggests that courts "should freely give leave when justice so requires." *Id.* This broad rule gives effect to the "federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities." *Laber v. Harvey,* 438 F.3d 404, 426 (4th Cir. 2006) (en banc) (citing *Conley v. Gibson,* 355 U.S. 41, 48 (1957)). The Fourth Circuit has interpreted Rule 15(a) to mean that "leave to amend should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile." *Laber,*

438 F.3d at 426 (citing *Johnson v. Oroweat Foods Co.,* 785 F.2d 503, 509 (4th Cir. 1986)). Courts should only deny leave to amend on the grounds of futility when the proposed amendment is clearly insufficient or frivolous on its face. *See Johnson,* 785 F.2d at 10. If, however, a court determines that the amendment would be futile, leave to amend may be properly denied. *See GE Inv. Private Placement Partners II v. Parker,* 247 F.3d 543, 548 (4th Cir. 2001).

Although unlikely because Rector was a Concierge without apparent access to billing records in BS Richmond, Bon Secours Facilities, or relevant physician practices, it is still possible that Relator may be able to plead with the requisite specificity to meet Rule 9(b). Typically, "[f]ailure to plead fraud with particularity . . . does not support a dismissal with prejudice. To the contrary, leave to amend is 'almost always' allowed to cure deficiencies in pleading fraud." *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996)) (quoting *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986)). Further, the Court is unable to determine whether Relator can proffer any additional facts without a proposed amended complaint. Accordingly, the Court will DISMISS Relator's Second Amended Complaint WITHOUT PREJUDICE.

## VI.    CONCLUSION

For the aforementioned reasons, the Court will GRANT Defendants' Motion to Dismiss on all Counts.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

An appropriate Order shall issue.

_____/s/_____
James R. Spencer
Senior U. S. District Judge

ENTERED this ___14th_____ day of April 2014.